(156 App. Div. 63.)

## In re BILLINGTON.

(Supreme Court, Appellate Division, First Department. April 4, 1913.)

ATTORNEY AND CLIENT (§ 42*)—DISBARMENT—AIDING A FUGITIVE.

An attorney for a fugitive from justice who goes beyond the mere giving of advice, and offers himself to forward a letter to throw the authorities off the scent, and to bribe an officer, and informs the authorities that he does not know his whereabouts, will be disbarred, although the prosecution against such fugitive afterwards is dismissed on failure of the complaining witness to appear.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 54; Dec. Dig. § 42.*]

In the matter of Reno R. Billington, an attorney. Judgment of disbarment.

See, also, 152 App. Div. 885, 136 N. Y. Supp. 1131.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Einar Chrystie, of New York City, for petitioner.
George Gordon Battle, of New York City, for respondent.

INGRAHAM, P. J. The charges against the respondent are based upon two letters written by him to one Stade, who was his client and against whom criminal charges had been made in connection with his business as a stockbroker, and who had left New York. These letters were addressed to Stade under an assumed name at Philadelphia. The writing of these letters is conceded, and it is conceded that the respondent knew before the writing of these letters that the district attorney was looking for Stade, and endeavoring to ascertain his whereabouts. Stade had disappeared so that the petitioner was unable to procure his attendance before the referee, but there is nothing on the record to connect the respondent with his disappearance, so that his testimony could not be procured. The only proof of the circumstances under which the letters were written was the testimony of the respondent before the referee.

The respondent testified that some time before the writing of these letters he had acted for Stade as his attorney; that in November, 1904, Stade came to him for advice, stating that he was in financial difficulties, and the respondent went over Stade's books, and. found he was insolvent, and suggested that Stade should make an assignment for the benefit of creditors, which he did. The day after the making of that assignment the respondent saw Stade, who told the respondent that some women that he had had dealings with would make a

---

lot of trouble for him. The respondent told Stade there was nothing criminal so far as he knew, and nothing for Stade to be afraid of; that, if they should swear out a warrant for his arrest, he had a father-in-law who had political influence in the Republican party, and probably had friends who would get him bail. Stade said he would not be arrested for anything, and that he would not under any circumstances stay to be arrested. The respondent advised Stade not to go away. Stade, however, told the respondent that he was going to Philadelphia, and that if the respondent would address letters to him (Stade) as "C. H. Matthews" they would be forwarded; that he thought he would go to Chicago and see his brother, and get his help to straighten up matters with his customers. The respondent then told Stade that he had seen a number of his customers, and that very little money would settle with them all. Stade then said he had furniture in his flat purchased upon the installment plan, but had not paid for it all, and respondent advised Stade to get his wife to sign a bill of sale to the respondent; that he should be paid something for attending to this matter for him, and Stade's wife gave the respondent a bill of sale under his agreement with Stade that this furniture was to be given to the respondent in payment of his fees. Stade then went away, and the respondent subsequently received a letter from him from Philadelphia. The respondent went to Stade's apartment, and was told by the janitor that Detective Sergeant McConville had been inquiring for Stade. McConville was known to the respondent as a detective sergeant stationed in Wall street, and connected with the district attorney's office. The respondent was satisfied from the fact that McConville had been looking for Stade that some indictment or criminal charge had been made against him. The respondent having acquired this information, and made these deductions, he wrote Stade a letter on November 25th. In that letter, which was addressed to "My Dear Matthews," the respondent informed Stade that he had been told by the janitor that Detective Sergeant McConville had been at his flat on Wednesday evening to find out about Stade, which was an indication that an indictment had been found, as he was attached to the district attorney's office, and then continued:

"I cannot think of any way you can be traced unless something slips out through Mrs. Matthews [meaning Stade's wife] or her maid. You will notice the initials were painted off your trunks and you should be careful not to have any writing in your trunks with any name on that might lead to inquiry. If I had one or two hundred I think I could get him to lay down on the warrant and not do very much hunting. Do you happen to have any influential friends in Tammany? Do not depend upon me to advise you about remaining there. I should say the further away the better. You are the best judge as to how well your identity is concealed. You might be as safe there as anywheres. * * * Only you ought to get busy and get together enough to be able to make Mrs. Brown still and call off the dogs of war."

The letter was then signed by the respondent and a postscript added:

"Better destroy my letters without delay."

In explaining this letter the respondent testified that he meant by the phrase, "If I had one or two hundred I think I could get him (McConville) to lay down on the warrant and not do very much hunting," that if he had $100 or $200 that amount would settle with the woman whom the respondent supposed, judging from his newspapers, had got the indictment, and that it was not his intention at the time that $100 or $200 should be paid to McConville as a bribe; that he meant by the inquiry as to whether Stade had any influential friends in Tammany that the respondent thought that, if Stade had some influence in Tammany, they would be able to get bonds for him; that he advised Stade to destroy his letters for Stade's own protection.

The second letter upon which these charges are based was written on February 27, 1905, was dictated to a typewriter, and was as follows:

"Dear Sir: I was served with a subpœna last week to appear before the district attorney to give him information regarding your whereabouts. It seems Mrs. Tyler has been taking your letters down to the district attorney's office and she informed them that letters were mailed to me to be delivered to you. I informed them that the only way I heard from you was that your wife called at my office about once a month and that any mail I had for you I gave to her but they seem to know through Mrs. Tyler that your wife was with you, and I told them that I thought you must both of you be in Brooklyn then.

"I think the best thing for you to do is to write a letter to Tyler the same as usual but date it March and leave the exact date blank and send it to me, I have a friend in Buffalo and he will address an envelope to Mr. Tyler in typewriting on some Buffalo hotel envelope and mail it. Mrs. Tyler will probably take the letter at once to the district attorney's office, and they will think you are in Buffalo, you had better also date your letter as from Buffalo, what excuse you can make to Tyler for letting him know where you are, you know best and you know best what kind of a letter to send him, the only thing I thought of doing was to throw the authorities off the track, of course you must send me Tyler's address so I can have the envelope properly addressed. I think it would be well for you to destroy this letter as well as all letters you receive from me and I think you had better not write to any one hereafter who is at all likely to allow your letters to fall in people's hands who can harm you. I notice you keep up a correspondence with your former servant girl, I think it is dangerous to do so, it does not matter how much you may think of her.

"Please let me hear from you at once and mail me the letter asked for above in order that I may have it attended to tomorrow or at the latest Wednesday and I would not hereafter write to Tyler any more. Of course you must not let any one know what I have written you in this letter and I wish hereafter you would write me as though it was your wife writing for you and then I can very easily say I have heard from your wife but not from you."

In regard to this letter the respondent testified that it was sent to the same address, "C. H. Matthews, 910 Spruce Street, Philadelphia;" that he had received notice from the district attorney to call on him; that he answered that summons and saw Mr. Gray, one of the assistant district attorneys, and McConville, the detective; that Mr. Gray asked the respondent if he knew Mr. Stade's address, and the respondent told him he did not. The assistant district attorney then said he understood that the respondent was getting letters from

Stade and forwarding letters to him, and the respondent told him that his wife came to the respondent's office, and, if there was any letters for Stade, they were not turned over to the assignee, but the respondent gave them to Mrs. Stade; that the respondent told the district attorney further that he was under the impression that they were living in Brooklyn.

The respondent further testified that after this last letter was written Stade's wife came to see· the respondent, but the first time he heard personally from Stade after that was in 1908, when he heard that he was arrested in New York; that after he was arrested the respondent appeared for him before the magistrate, but the complainant in that proceeding did not appear, and Stade was discharged; that about a year after Stade came to the respondent's office and took desk room there when Stade acted for the respondent in organizing some companies; that Stade got possession of some of the bonds of one of these companies that Stade and the respondent had organized together; that Stade insisted on keeping them for his service when the respondent turned Stade out of his office; that subsequently Stade's wife sued him to recover back the furniture that respondent had received from them; that after the trial of that action by Stade's wife against the respondent was commenced ·the respondent made a settlement with her, and turned over the furniture to her.   The respondent then said he had never had any intention at any. time of advising Stade to bribe any one or commit any offense nor to advise Stade to abscond so as to avoid arrest and criminal prosecution; that he wrote these letters thoughtlessly and probably ill-advisedly, and the respondent then made a general statement to the referee, in which he said the letters could be interpreted in more than one way; that the letters could be interpreted from the viewpoint that the respondent was a moral degenerate and tried to induce his client to abscond because of the criminal proceedings, and advising him to bribe officials, but that that was furthest from his thoughts.   He then made a statement as to his education and his former activities stating his Masonic connection, and that he wrote these letters thoughtlessly and recklessly, but his intention was not what could be spelled out of them; that he advised· Stade not to run away, but that he went in spite of his advice; that when he got to the district attorney's office, and Mr. Gray, the assistant district attorney, asked the respondent for the address of Stade, he was in a quandary; he did not know where Stade was, and told him so truthfully; that his writing about the $100 or $200 for the detective was merely to show Stade that the respondent was master of the situation, and there was nothing for him to worry over; that, though a detective had inquired for him, he need not worry, but to go and get a few hundred dollars, and he could settle everything that was here.

Of course, this explanation is absurd on its face.   His reference to Stade's father-in-law as a Republican politician, his inquiry as to Stade's obtaining some Tammany influence, and then a request for $100 or $200 to get the detective to lay down on the warrant, and not to do very much hunting, could have had but one meaning in the respondent's mind, and could have but one meaning to Stade.   Here

Stade was advised that if the respondent had $100 or $200 he could induce the detective to lay down on the warrant, or, in other words, induce the detective not to enforce it. It was the respondent that was to use the $100 or $200 for the purpose mentioned. All that Stade was to do was to furnish the money. Here was a direct proposition to Stade that, if Stade would furnish him with money, the respondent would commit the crime of bribery. Section 378 of the Penal Law (section 78, Penal Code) provides that a person who gives or offers or causes to be given or offered a bribe or any money, property, or value of any kind or any promise or agreement therefor to a person executing any of the functions of a public office with intent to influence him in respect to any act, decision, vote, or other proceedings in the exercise of his powers or functions is punishable by imprisonment for not more than 10 years or by a fine of not more than $5,000 or both. Section 1822 of the Penal Law (Penal Code, § 44) provides that a person who gives or offers a bribe to any executive officer of this state with intent to influence him in respect to any act, decision, opinion, vote, or other proceeding as such officer is punishable by imprisonment in state's prison not exceeding 10 years or by a fine not exceeding $5,000 or both. And section 1837 of the Penal Law (Penal Code, § 58) makes the provisions in relation to executive officers also applicable to administrative officers. Section 1839 of the Penal Law (Consol. Laws 1909, c. 40; Penal Code 1907, § 115; Code Civ. Proc. 1910, § 159) provides that any sheriff, constable, or other ministerial officer, and every deputy or subordinate of any ministerial officer, who (1) receives any gratuity, or reward, or any security or promise of one to procure, assist, connive at or permit any prisoner in his custody to escape, whether such escape is attempted or not, or commits any unlawful act tending to hinder justice, is guilty of a misdemeanor. Section 1841, Penal Law (Penal Code, § 117), provides that a public officer or person holding a public trust or employment, upon whom any duty is enjoined by law who willfully neglects to perform the duty, is guilty of a misdemeanor. Section 1857 (Penal Code, § 154) provides that where any duty is or shall be enjoined by law upon any public officer, or upon any person holding a public trust or employment, every willful omission to perform such duty where no special provision shall have been made for the punishment of such delinquency is punishable as a misdemeanor.

The direct effect of this communication to Stade, who was a fugitive from justice, was that, if this respondent was furnished with this sum of money, he could thus by it induce a detective sergeant to commit a crime, and, if he had himself acted in the way that he suggested that he would act if the money was provided, he would be guilty of a crime within the provisions of the Penal Code, and the Penal Law to which attention has been called. The respondent was not advising his client as to what the client should do, but advising his client as to what he himself would do if he was furnished the money to accomplish the purpose. The respondent held a public office, was an attorney and counselor at law who had sworn to faithfully perform the duties of his office. And then in regard to the let-

ter of February 27th. The person to whom it was addressed was a fugitive from justice, having departed from this state to avoid a criminal prosecution. The district attorney of the county had endeavored to ascertain Stade's whereabouts, and in the discharge of his duty had summoned this respondent to give him information on the subject. The respondent writes to the fugitive from justice, stating the efforts made by the district attorney, and stating that he had given the district attorney wrong information for the purpose of deceiving him, and then the respondent proposes to the fugitive from justice a device by which the district attorney could be misled and the whereabouts of Stade concealed. This advice was not as to what he, the client, should do, but was a scheme which involved action by the respondent. Stade was to write a letter dated Buffalo, although he was at that time in Philadelphia or some other place as the respondent well knew, directed to a Mr. Tyler, who would communicate the information that he received to the district attorney. This letter was to be sent, not by Stade to the person to whom it was addressed, but to the respondent, and the respondent was then to procure a friend of his in Buffalo to address the envelope by typewriting to the person to whom it was to be sent in New York, and procure it to be posted in Buffalo. It was the respondent who was to be the active participant in this scheme to deceive the prosecuting officers of New York in the discharge of their duty, and as the respondent himself said in his testimony: "The only thing I thought of doing was to throw the authorities off the track." It was the respondent who was to throw the authorities off the track—not his client, to whom the advice was addressed. All that his client was required to do was to furnish the respondent with the means of accomplishing this purpose.

Section 1851 of the Penal Law (Penal Code, § 124) provides:

"A person who, in any case or under any circumstances not otherwise specially provided for, wilfully resists, delays, or obstructs a public officer in discharging, or attempting to discharge, a duty of his office, is guilty of a misdemeanor."

Here the respondent informs his client that he had obstructed the district attorney of this county in the performance of his duty by making false statements as to his knowledge of Stade's address, and proposed to further obstruct him in the performance of his duty by procuring a letter which he understood would fall into the hands of the district attorney to be posted in Buffalo for the avowed purpose of throwing the authorities off the track. The respondent had represented Stade as his counsel. He had, of course, the right to advise Stade as to the course that he should adopt which would best protect his interests. When called upon by the public authorities for information as to Stade, he had the right to refuse to answer any questions as to a fact which had been communicated to him by his client, or which he had ascertained in the course of his professional employment. But he certainly was not justified in giving the district attorney or the public authorities false information or misstating facts which would obstruct the district attorney in the performance of his

duties, or to do any act which would assist any person charged with a crime escaping prosecution therefor, or prevent or obstruct the officers of the law from performing their duties.

I wish to clearly emphasize the fact that this offense is not that the respondent gave to his client advice, but that this attorney proposed to his client that he, the attorney, would, if furnished with money, bribe or endeavor to bribe a police officer to refrain from discharging his duty, and that, if furnished with a decoy letter, he, the attorney, would cause it to be posted at a place in New York state so that, when it was received by the public authorities, they would be thrown off the track. It was the act that the respondent, an attorney and counselor at law, himself proposed to do that constitutes the offense, not any advice that he gave to his client as to what his client should do; and it is this offense that we are called upon to consider.

The referee before whom the respondent testified has found that "the respondent's explanation of the meaning that he had intended to convey in and the results meant to be brought about by the letters abounds in inconsistencies and is very unsatisfactory," and sustains the charges of professional misconduct, and in that conclusion we concur. The fact that years afterwards when Stade returned to this state for some reason the complainant against him did not appear before the magistrate does not in any way mitigate the offense. On cross-examination the respondent testified that Mrs. Stade was in his office before February 25, 1905, at the time he wrote the letter of that date, and also before the time he saw the district attorney, but she was in his office about a month or a month and a half after Stade left. It seems to me there can be no doubt but that the respondent was in constant communication with Stade, was constantly advising him as to his affairs, and by these letters he deliberately and intentionally undertook to obstruct the administration of justice, and prevent the district attorney of this county and the public officials from ascertaining Stade's whereabouts, and enforcing the criminal law against him. The respondent suggested to Stade that he, the respondent, would violate the law of this state, and not only advised but actually attempted to participate in and obstruct the administration of justice. Such conduct is absolutely inconsistent with the duties assumed by a lawyer when he takes his oath of office; tends to subvert the enforcement of the criminal law of the state; and an attorney who advises and attempts to participate in such acts is unfitted to be a member of the bar.

The respondent is therefore disbarred. All concur.